CAFFERKEY, ADMX., ET AL., APPELLANTS, *v.* TURNER
CONSTRUCTION COMPANY, APPELLEE, ET AL.

[Cite as Cafferkey *v.* Turner Constr. Co. (1986), 21 Ohio St. 3d 110.]

(No. 84-1600—Decided January 22, 1986.)

*Miller, Stillman & Bartel* and *Willard E. Bartel,* for appellant Cafferkey.

*Wuliger, Fadel & Beyer, William Fadel, William D. Beyer* and *Frances M. Gote,* for appellant Davis.

*Thompson, Hine & Flory, William H. Wallace* and *Douglas N. Barr,* for appellee.

WRIGHT, J.   The issue presented is whether a general contractor merely by virtue of its supervisory capacity over the worksite owes a duty of care to the employees of a subcontractor engaged in inherently dangerous work.

In *Hirschbach* v. *Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St. 3d 206, the syllabus holds:

"One who engages the services of an independent contractor, and who *actually participates* in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor." (Emphasis added.)

This court in *Hirschbach* reversed a summary judgment for the defendant who contracted with the injured man's employer to repair the defendant's electrical tower. The contractor's employee fell when the tower broke under tension from the contractor's winch line. The *Hirschbach* majority premised the defendant's liability on his denial of the contractor's request to position the winch line outside the defendant's property.

Three members of the court dissented in *Hirschbach,* citing decisions that bar recovery when the injury results from risks inherent in the contractor's assigned task. *Wellman* v. *East Ohio Gas Co.* (1953), 160 Ohio St. 103 [51 O.O. 27]; *Schwarz* v. *General Electric Realty Corp.* (1955), 163 Ohio St. 354 [56 O.O. 319]; *Evans* v. *Whirlpool Corp.* (1967), 10 Ohio St. 2d 240 [39 O.O.2d 372]; and *Briere* v. *Lathrop Co.* (1970), 22 Ohio St. 2d 166 [51 O.O.2d 232]. The majority distinguished *Wellman* because in *Hirschbach* the defendant had "actually participated in the job operation performed by the crew of the independent contractor." *Id.* at 208.

In the present case, Turner relies on the same "inherent risk" decisions, noting that *Hirschbach* does not overrule these decisions. *Hirschbach* authorizes liability if the defendant "actually participate[s] in the job operation" and negligently fails to eliminate a risk inherent in the contractor's job. The undisputed facts establish that Turner did not actively participate in any action or decision that led to the fatal injuries. Turner may have known about some of Millgard's activities, but that knowledge does not constitute "actual participation" in those activities within the *Hirschbach* rule. Unlike the landowner in *Hirschbach,* Turner neither gave nor denied permission for the critical acts that led to the decedent's injuries.

As already noted, Millgard alone made the decisions to attempt to drive the lowest casing in hole A-3 deeper into the ground and to send the men down into the hole after the twister bar became jammed. Turner personnel were not consulted about either decision. Caisson installation is known to be dangerous work and Millgard was aware that highly explosive methane gas was present beneath the worksite.

Appellants assert that certain provisions of the contract between

Turner and Millgard as well as certain portions of Turner's safety manual reveal Turner's retention of control over safety procedures at the project site. Turner had an obvious interest in safety and it insisted that its own employees as well as the employees of subcontractors carry on their work activities in as safe a manner as possible. Nevertheless, this concern for safety, which was evidenced in a variety of ways, does not constitute the kind of active participation in Millgard's work that is legally required to create a duty of care extending from Turner to Millgard's employees.

The Turner "Safety Program" is a one-page list of general safety requirements directed toward all subcontractors. Turner advised everyone concerned that hard hats must be worn, appropriate eyewear and footwear must be available for use, and the like. This safety program was nothing more than a handy, brief reference sheet to remind subcontractors about the fundamental "do's and don'ts" at the construction site.

The contract language pertaining to job safety is nothing more than standard "boilerplate" terminology common to virtually all construction contracts. Turner retained the ability to monitor and coordinate the activities of all subcontractors in order to ensure compliance with the architect's specifications. The various contractual rights reserved by Turner did not empower Turner to control the means or manner of Millgard's performance. Millgard, the acknowledged expert in caisson installation, assumed the responsibility to construct and install caissons in a sound, efficient, and safe manner.

The details of Millgard's performance were directed and carried out solely by Millgard's employees. Turner did not direct or interfere with Millgard's work.

A general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work. The trial court correctly granted, and the court of appeals properly affirmed, summary judgment in favor of Turner.

Accordingly, the judgment of the court of appeals as to Turner is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER, HOLMES and DOUGLAS, JJ., concur.

CELEBREZZE, C.J., and C. BROWN, J., dissent.

CELEBREZZE, C.J., dissenting. I concur with Justice Brown's well-reasoned conclusion that the determinative issue in this case is whether the general contractor, Turner, retained custody and control of the premises on which appellants' decedents met their deaths.

Further, it is clear that Turner's involvement in controlling safety on this job site, through its safety program, went well beyond the "handy reminders" referred to in the majority opinion. The record is replete with memoranda from Turner's supervisors and its insurer directing and recommending that Millgard correct safety violations ranging from a defective buzzer on a front-end loader to the storage of gases. Thus, Turner, to the extent that it retained control of safety on the premises, actually participated in Millgard's work.

It must not be forgotten that the fundamental purpose of R.C. 4101.11 and 4101.12 is to provide employees with a safe place to work. This was the basis of the federal district court's opinion in *Foraker* v. *Cyclops Corp.* (N.D. Ohio 1985), 605 F. Supp. 641, where the court thoroughly examined *Wellman* v. *East Ohio Gas Co.* (1953), 160 Ohio St. 103 [51 O.O. 27], *Hirschbach* v. *Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St. 3d 206, and *Walker* v. *Mid-States Terminal, Inc.* (1984), 17 Ohio App. 3d 19, as well as the opinion of the court of appeals in the instant case. In *Foraker,* an employee of an independent contractor was severely burned while cleaning a zinc dust collector at the defendant's plant. The defendant contended that it owed no duty of care to the independent contractor because the contractor's employees were aware of the hazardous nature of their work. The court concluded that there was sufficient evidence to find that the defendant retained custody and control of the premises by virtue of an agreement which required the contractor to comply with all of the defendant's safety rules and regulations. Thus, the court concluded, summary judgment in favor of the defendant was precluded and the defendant could be liable under R.C. 4101.11 and 4101.12, stating:

"* * * It is true that a landowner hires a subcontractor to do work requiring special skills or knowledge and that often this decision is motivated by the knowledge that an inherent danger or risk is involved. At the same time, it is not the rule in Ohio that once the hiring decision is made the independent contractor and his employees are completely independent and stripped of protection. * * *" *Foraker, supra,* at 651-652.

In the instant case, as Justice Brown has illustrated, there is a question of fact as to whether Turner and its supervisors did all that they could have done to ensure the safety of appellants' decedents on the date of this accident. It is apparent that Turner's supervisor took a "hands off" approach to the work being done when this incident occurred. The majority views this as a lack of "active participation" in the subcontractor's work, thus insulating Turner from liability.

However, to the extent that Turner actually participated in Millgard's activities by retaining control of job safety, a jury might view this "hands off" approach as an abdication of Turner's statutory duty to provide safe working conditions. Thus, summary judgment in the instant case is both premature and inappropriate.

For the foregoing reasons, I must respectfully dissent.

C. Brown, J., concurs in the foregoing dissenting opinion.

Clifford F. Brown, J., dissenting. I must respectfully dissent from the majority's affirmance of the judgment of the court of appeals in this case. I do so because the summary judgment as to Turner was improperly granted. Where a general contractor retains control over the premises of the job, and retains authority to participate in an independent subcontractor's work, the general contractor owes a duty to all frequenters of the job site to exercise that retained authority when the general contractor knows, or reasonably should know, that the subcontractor is proceeding with work in a dangerous manner.

That statement of the general contractor's duty of care flows from *Hirschbach* v. *Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St. 3d 206, in which we held that:

"One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor."

The general contractor's duty of care arises from R.C. 4101.11 and 4101.12. In *Walker* v. *Mid-States Terminal, Inc.* (1984), 17 Ohio App. 3d 19, now-Justice Douglas, the author of that court of appeals' opinion, had occasion to analyze this court's decision in *Hirschbach.* He stated, at 22, that "[a] careful review of the decision reveals that, in accordance with previous case law, the determination as to the applicability of the Ohio 'frequenter' statutes (R.C. 4101.01 *et seq.*) in the *Hirschbach* case turns upon a finding that the defendant had retained custody and control over the premises, as established by the fact of the inspector's direct participation in the operations of the independent contractor. * * *" In that case, one of the determinative factors was the general contractor's retention of authority to stop its subcontractor's work and direct changes in the face of safety-oriented emergencies. There, as here, the general contractor had failed to exercise that authority; there, as here, summary judgment was inappropriate.

In this case, Turner, the general contractor, and Millgard, the subcontractor, entered into a written contract. In that contract, Turner retained the right to "* * * stop any part of the Work which Turner deems unsafe until corrective measures satisfactory to Turner have been taken * * *." If Millgard neglected to take such corrective measures, Turner reserved the right to undertake them at Millgard's cost.

Further, Turner's own safety bulletins acknowledged Turner's responsibility for working conditions as follows: "We are General Contractors and usually as such are responsible for the general conditions which exist on each project we build. * * *" "Subcontractors are also required to adhere to the safety requirements. Superintendents should be sure that

Subs are aware of and follow the sections of the regulations applicable to their work. * * *'' "Constant supervision by the Superintendent and responsible staff members is required to eliminate unnecessary hazards on our work." "* * * Our superintendents must always be alert to prevent unsafe conditions from developing, not only on our own work but on that of others engaged on the project." The majority's attempt to dismiss Turner's contractual language regarding job safety as mere "boilerplate" ignores Turner's documented acknowledgements that it intended to actually participate in Millgard's work, at least to some degree.

Indeed, the record reveals that Turner followed through on its stated intent to closely supervise Millgard's work. In his deposition, Turner's assistant superintendent, Neil J. Carothers III, acknowledged that he was on the job site the day of the explosion, and was aware that methane gas had been detected in the A-3 Hole. Just before the explosion, Carothers heard the drill motor stop, and went to investigate. When Millgard's personnel "impolitely" asked him to leave, Carothers left, choosing not to exercise Turner's contractual right to ensure that corrections were safely made..

Civ. R. 56(C) provides that summary judgment shall be rendered only if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In considering a motion for summary judgment supported by evidence, summary judgment "shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor." *Id.* The court of appeals noted that, in the light most favorable to plaintiffs, "* * * there is some evidence that the general contractor's supervisors attended the job site to oversee and coordinate safety. The general contractor's personnel knew that methane was present in the hole where the decedents sustained their injuries." The court of appeals further stated that the evidentiary materials "establish[ed] without dispute that the general contractor assigned the subcontractor all duties related to the excavation involved here." Thus, the court of appeals, in essence, held that Turner, by contract, had effectively assigned those safety responsibilities to Millgard, thus escaping liability as a matter of law.

However, a general contractor should not be able to delegate, by its contract documents, responsibility for all safety precautions on the site, while retaining full authority and control over the premises and the right to direct supervision of its subcontractor's work. To avoid liability, the delegation must be complete, and retention of control over the premises and the subcontractor's means of performance abandoned. I would hold that a general contractor's contractual delegation of safety responsibilities does not relieve all liability to its subcontractor's employees where, as

here, the general contractor retains control over the premises, retains general supervisory control over the subcontractor, and retains authority to intervene and participate in the work whenever the general contractor finds that its subcontractor is proceeding in an unsafe manner. Therefore, the trial court's grant of summary judgment in favor of Turner was inappropriate. The jury was entitled to consider whether and to what extent Turner had breached its duty of care.

Accordingly, the judgment of the court of appeals should be reversed, and the cause remanded for trial.

CELEBREZZE, C.J., concurs in the foregoing dissenting opinion.